IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT E. SMITH, | ) | CASE NO. 1:12CV2062 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, [1] | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff Robert E. Smith ("Plaintiff" or "Smith") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act

(the "Act"), 42 U.S.C. §§ 416(i) and 423, and Supplemental Security Income ("SSI") under Title

XVI of the Act, 42 U.S.C. § 1381 *et seq.*  Doc. 1.  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties.  Doc. 13.  As set forth below, the Administrative

Law Judge erred at Step Three of the sequential analysis because she misstated the opinion of the

medical expert and then failed to properly analyze that opinion.  Accordingly, the Court

**REVERSES AND REMANDS** the final decision of the Commissioner for further proceedings

consistent with this Opinion and Order.

## I.  Procedural History

Smith filed applications for DIB and SSI on May 15, 2008, alleging a disability onset

date of July 30, 2002.[2]  Tr. 84-87, 123-38.  He claimed that he was disabled due to a number of

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is hereby substituted for Michael J. Astrue as the Defendant in this case.

impairments, including Hepatitis C, severe depression, Barrett's esophagus, high blood pressure, high cholesterol, and bleeding polyps. Tr. 88-94, 152.  Smith's applications were denied initially and on reconsideration.  Tr. 88-110.  At Smith's request, on July 22, 2010, a hearing was held before Administrative Law Judge Suzanne A. Littlefield (the "ALJ").  Tr. 47-83.  On August 27, 2010, the ALJ issued a decision finding that Smith was not disabled.  Tr. 15-32.  Smith requested review of the ALJ's decision by the Appeals Council on September 16, 2010.  Tr. 14.  On June 29, 2012, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A.    Background

Smith was born on August 3, 1962, and was 47 years old at the time of the administrative hearing.  Tr. 52.  He dropped out of high school when he was in the 10th grade.  Tr. 53.  Smith worked previously as a truck driver and dock worker.  Tr. 125, 133, 162, 166, 190.  At the time of the hearing, he lived with his brother.  Tr. 53.

### B.    Medical Evidence

#### 1.    Treatment History Concerning Smith's Mental Impairments [3]

On May 28, 2008, [4] Smith was admitted to MetroHealth Medical Center ("MetroHealth") for observation, complaining of "diffuse abdominal pain."  Tr. 330-41.  Smith reported that he

---

[2] Because of a prior adjudicated period through March 17, 2005, Smith's earliest possible onset date for DIB in this case was March 18, 2005.  Tr. 419.  20 C.F.R. §§ 404.620(a), 416.330(a) (2012).  Smith was last insured for DIB on September 30, 2007.  Tr. 139.  To be entitled to DIB, therefore, Plaintiff had to show that he was disabled on or after March 18, 2005, and on or before September 30, 2007. 20 C.F.R. §§ 404.130-.132. To be entitled to SSI, Smith had to show that he was disabled on or after June 1, 2008, and before August 27, 2010, the date of the ALJ's decision. Tr. 32.  20 C.F.R. § 416.335.

[3] Smith does not challenge the ALJ's conclusions concerning his physical impairments.  Accordingly, this opinion will focus on Smith's medical history as it relates to his mental impairments.

[4] It should be noted that there is no medical evidence in the record prior to May 2008.

2

had taken a "handful" of Vicodin and Valium and had drunk eight beers because he "didn't want to be around anymore." Tr. 334.  Harry Pollock, M.D., examined Smith while he was at MetroHealth and observed that he was disheveled, malodorous, displayed a depressed mood, and had poor judgment and insight.  Tr. 339.  However, Smith was fully oriented, alert, calm, cooperative, friendly, with mood-congruent affect, appropriate and spontaneous speech, logical and organized thought, and sustained memory and attention.  Tr. 339.  Dr. Pollock diagnosed Smith with major depressive disorder and noted that Smith was experiencing alcohol withdrawal Tr. 338-340.  Dr. Pollock assigned a Global Assessment of Functioning ("GAF") score of 25-35.[5]  Tr. 339.  Smith was transferred from MetroHealth to St. Vincent Charity Hospital ("St. Vincent") on June 2, 2008, because he was still a suicide risk. Tr. 278-90, 341.

Upon his arrival at St. Vincent on June 2, 2008, Smith was seen by Sarah Aronson, M.D. Tr. 278-82.  Smith reported increased drinking during the week before his admission to MetroHealth, with associated decreased mood and increased anxiety.  Tr. 278.  Dr. Aronson noted that Smith had a history of alcohol dependence and use of benzodiazepine and opiates, as well as cocaine and marijuana.  Tr. 281.  Smith reported that he felt "fine" since being on his medications and not drinking.  Tr. 280.  His mental status was reported as "much improved."  Tr. 278.  Dr. Aronson noted that Smith's mood was only "mildly dysphoric," and that he was well groomed, pleasant, with normal speech, normal and congruent affect, normal thought form,

---

[5] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision, Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 21 and 30 indicates "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g. stays in bed all day; no job, home, or friends)."  A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."

intact memory, good fund of knowledge, normal abstract thinking ability, no suicidal or homicidal ideation, no psychotic symptoms, fair insight, and fair to good judgment.  Tr. 278-79. She diagnosed Smith with possible depression and assigned a GAF score of 40-50.[6]  Tr. 279.

On July 31, 2008, Smith saw Pon Tsou, M.D., at MetroHealth.  Tr. 360-64.  Smith stated that he had trouble sleeping, low energy, and feelings of helplessness, hopelessness and guilt. Tr. 360-61.  He stated that he drinks alcohol so he does not have to remember all of the "bad things."  Tr. 361.  Dr. Tsou noted that Smith had a history of alcohol dependence and substance abuse, including acid and cocaine.  Tr. 361.  Mental status examination revealed questionable judgment and insight, depressed mood, and a flat (albeit congruent) affect.  Tr. 363.  However, Dr. Tsou noted that Smith was in no acute distress, was cooperative, fully oriented, with normal speech, logical and organized thought processes, tight association, sustained attention and concentration, appropriate language, and "okay" fund of knowledge.  Tr. 363.  Dr. Tsou diagnosed major depressive disorder and post traumatic stress disorder ("PTSD"), and assigned Smith a GAF of 51-60.[7]  Tr. 363-64.

Smith saw Ridhi Bansal, M.D., at MetroHealth on August 15, 2008.  Tr. 372-374.  Smith stated that he had tried to commit suicide ten days earlier by cutting his arm.  Tr. 372.  Dr. Bansal noted that Smith had expressed suicidal ideations by stating that he "just wanted to go to sleep and not wake up."  Tr. 372.  Smith reported that he did better when he was taking his medications but that he had been off his medications for about a week because he could not afford them.  Tr. 372.  Dr. Bansal diagnosed major depressive disorder (recurrent), a history of PTSD, and alcohol and drug dependence.  Tr. 373.  He assigned Smith a GAF score of 1-10

---

[6] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

[7] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  DSM-IV-TR at 34.

4

because of a perceived risk of self-harm[8] and recommended that Smith be admitted to
MetroHealth for observation.  Tr. 373.  Smith was subsequently admitted to MetroHealth for
observation and was then transferred to Northcoast Behavioral Health.  Tr. 380.  He remained
hospitalized for five days and was discharged on August 20, 2008.  Tr. 385-388.  Prior to his
discharge, Smith was examined by S. Efran Ahmed, M.D., at Northcoast.  Tr. 385-88.  After five
days with no alcohol or drugs, and being compliant with his medications, Dr. Ahmed noted that
Smith's mood was euthymic and that Smith reported that he "felt great."  Tr. 386.  Dr. Ahmen
also noted that Smith was awake, alert, and oriented times three, had normal speech, had no
mania or hypermania, had no psychotic signs or symptoms, had no suicidal or homicidal
ideations, had no psychotic symptoms, had goal-directed and logical thought processes, and had
good insight and judgment.  Tr. 386.  Dr. Ahmed diagnosed depression, NOS, alcohol
dependence, opiate dependence, cannabis dependence, and nicotine dependence. Tr. 387-88.  He
also ruled out substance-induced mood disorder and substance-induced depression, as well as
malingering, and assigned Smith a GAF of 65.[9]  Tr. 388.

Smith had a follow-up appointment with Dr. Tsou on August 29, 2008.  Tr. 582-583.
Smith stated he was "hanging in there" but was having difficulty sleeping.  Tr. 582.  He reported
that he spent most of his time during the day doing "side jobs" so he could afford his
medications.  Tr. 582.

---

[8]  A GAF score between 1 and 10 indicates "persistent danger of severely hurting self or others (e.g., recurrent
violence) or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation
of death.  DSM-IV-TR at 34.

[9]  A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or
some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the
household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at
34.

On April 8, 2009, Smith saw Xiangyang Zhao, M.D, a psychiatrist at MetroHealth.  Tr. 715-717.  Smith reported that he was "doing better" and was taking his medications as prescribed.  Tr. 715.  Upon exam, Dr. Zhao noted that Smith was disheveled with poor hygiene and limited eye contact, his mood was withdrawn and anxious, his speech was spontaneous and lacked coherence at times, his thought process contained loose associations, his mood was depressed and anxious, his affect was constricted and blunt, and his recent and remote memory were poor.  Tr. 715.  Dr. Zhao reported that Smith was functioning at "baseline" and was having great difficulty in dealing with his traumatic history.  Tr. 716.  Dr. Zhao diagnosed severe PTSD and major depressive disorder.  Tr. 716.  At a follow-up appointment with Dr. Zhao on May 12, 2009, Smith stated that was doing "okay" and did not want to go to a shelter because he did not want to be around a lot of people.  Tr. 712-714.  Dr. Zhao noted that Smith was "doing better," "taking pills as prescribed," and had "somewhat improved" mood.  Tr. 715-16.  He also noted "some improvement in suicidality."  Tr. 716.

On June 9, 2009, Dr. Zhao completed a medical source statement regarding Smith's mental capacity.  Tr. 616-617.  He opined that Smith had "good" abilities (satisfactory functioning) to leave home on his own.  Tr. 617.  Dr. Zhao also found that Smith had "fair" abilities (i.e., moderately limited but not precluded; may need special consideration and attention) in the following areas: relating to co-workers; dealing with work stresses; understanding, remembering and carrying out complex job instructions; understanding, remembering, and carrying out detailed, but not complex job instructions; understanding, remembering, and carrying out simple job instructions; and managing funds/schedules.  Tr. 616-17.  Dr. Zhao further opined that Smith had "poor" abilities, i.e., function is significantly limited, in the following areas: following work rules; using judgment; maintaining attention and

6

concentration for extended periods of 2 hour segments; responding appropriately to changes in routine settings; maintaining regular attendance and being punctual within customary tolerances; dealing with the public; interacting with supervisor(s); functioning independently without special supervision; working in coordination with or proximity to others without being unduly distracted or distracting; completing a normal workday and work week without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; socializing; behaving in an emotionally stable manner; and relating predictably in social situations. Tr. 616-617. In support of these limitations, Dr. Zhao noted clinical findings including Smith's hypersensitivity, avoidance, flashbacks from PTSD, and vegetative symptoms from his depression. Tr. 617.

Smith's treatment was then transferred to the MetroHealth psychiatric attending physician Michael Tran, M.D., who examined Smith on June 22, 2009. Tr. 702-703. Upon exam, Dr. Tran noted poor mood, energy and motivation. Tr. 702. He diagnosed Smith with major depressive disorder, PTSD, and alcohol dependence in remission. Tr. 703. At a follow-up appointment with Dr. Tran on June 23, 2009, Smith reported that his mood had not changed, he still had suicidal thoughts, and that he felt hopeless and helpless. Tr. 699-701. Smith stated that he drank a "couple of beers" two days prior to the appointment. Tr. 699. Dr. Tran reported that Smith appeared severely depressed, was withdrawn with minimal eye contact, and showed some psychomotor retardation. Tr. 699. Dr. Tran took Smith to the emergency department at MetroHealth for inpatient admission because he felt that Smith was actively suicidal. Tr. 626-650, 699-700. Smith was admitted to MetroHealth for depression and suicidal ideations on that date. Tr. 626-650.

7

While in the emergency department, Smith was seen by Jose Mendez, M.D.  Tr. 630-33.
Smith stated that he drinks only when he is not taking his medication.  Tr. 623-33.  He admitted
to drinking the day before, as well as taking three to four Valium.  Tr. 630.  Upon examination,
Smith was sad and tearful, his speech was slow, he had distractible memory and attention, and
his judgment and insight were poor.  Tr. 630.  A toxicology screening was positive for opiates
and marijuana (THC).  Tr. 630.  Dr. Mendez assigned a GAF of 11-20.[10]  Tr. 633.  Smith was
discharged on June 28, 2009.  Tr. 645-650.

Smith continued to see Dr. Tran over the next several months.  Tr. 669-694.  On July 31,
2009, Smith reported that he had not consumed alcohol since his last hospital stay in June 2009.
Tr. 689-691.  At an appointment on August 14, 2009, Dr. Tran noted Smith's mood as euthymic,
with an essentially normal mental status, and diagnosed major depressive disorder, rule out
substance induced mood disorder.  Tr. 682-83.

Deepa Nadimpalli, M.D. took over care of Smith on December 9, 2009.  Tr. 666-668,
669-670.  At an appointment on that date, Smith stated that he ran out of his medications
approximately two weeks prior and that he was "not doing good" without his medications.  Tr.
666.  He also reported that he had not consumed alcohol for "a couple years."  Tr. 666-68.
Except for slow speech, poor hygiene, depressed mood, and flat affect, Dr. Nadimpalli noted a
normal objective mental status.  Tr. 666-67.  Dr. Nadmipalli's diagnosed major depressive
disorder, recurrent, and antisocial personality disorder.  Tr. 667.  At a follow-up appointment on
March 16, 2010, Dr. Nadimpalli noted that Smith "smells of alcohol."  Tr. 870.  Smith denied
consuming alcohol that day but admitted drinking the night before.  Tr. 870.  Dr. Nadimpalli
noted that Smith was non-compliant with medications.  Tr. 870.  Except for blunt affect and

---

[10] A GAF between 11 and 20 indicates "some danger of hurting self or others (e.g., suicide attempts without clear
expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimum hygiene (e.g.,
smears feces) or gross impairment in communication (e.g. largely incoherent or mute)." DSM-IV-TR at 34.

slowed speech, Dr. Nadimpalli noted a normal mental status, including cooperative and calm behavior, adequate grooming, fair judgment and insight, and fair mood.  Tr. 871.

### 2.    State Agency Reviewing Physician

On September 8, 2008, state agency psychologist Kevin Edwards, Ph.D., reviewed the record and completed a Mental RFC Assessment and a Psychiatric Review Technique Form ("PRTF").  Tr. 389-420.  On the Mental RFC Assessment, Dr. Edwards opined that Smith had moderate limitations in the following areas: maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; and responding appropriately to changes in the work setting.  Tr. 389-390.  Dr. Edwards opined that Smith was not significantly limited in any other areas.  Tr. 389-90.  On the PRTF,[11] Dr. Edwards opined that Smith had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and one or two episodes of decompensation.  Tr. 403.  Dr. Edwards concluded that Smith could perform work that consisted of simple, repetitive, 1-3 step tasks, with no frequent changes, no strict or high production rate, and no requirement for confrontational interaction, or negotiation.  Tr. 392.  On December 23, 2008, state agency psychologist Suzanne Castro, Psy.D., reviewed the record evidence and affirmed Dr. Edwards' assessment.  Tr. 615.

---

[11]  Dr. Edwards' assessment covered the period of May 15, 2008, to September 8, 2008.  Tr. 393.  He noted that there was insufficient evidence to conduct an assessment of Smith's functional capacity prior to May 15, 2008.  Tr. 392. Dr. Edwards also noted that his functional assessment related only to Smith's SSI application because there was insufficient evidence in the record prior to Smith's date last insured to complete such an analysis for his DIB application.  Tr. 419.

**C.      Administrative Hearing**

**1.      Smith's Testimony**

On July 22, 2010, Smith appeared with counsel and testified at the administrative hearing before the ALJ.  Tr. 49-69.  He testified that he was sexually assaulted during his youth and, as a result, he is depressed and thinks about suicide daily.  Tr. 59-60, 65.  Smith stated he has difficulty concentrating.  Tr. 60-61.  He stated that he does not like to be around people and prefers to stay to himself.  Tr. 65.  Smith testified that, while he used to drink alcohol to ease his pain, he quit drinking over a year prior to the hearing.  Tr. 73.  He explained that he stopped using cocaine approximately six to seven years prior to the hearing and that he also stopped using marijuana.  Tr. 63, 73.  Smith stated that he takes about ten prescription medications daily and, without them, he shakes involuntarily and experiences panic attacks.  Tr. 56, 67-68.  He also explained that some of his medications cause adverse side effects, including trouble breathing and unexpected loose bowels. Tr. 55.  Smith stated that he has regular appointments with a psychiatrist and meets with a counselor in between those sessions.  Tr. 63-64.

**2.      Medical Expert's Testimony**

Donald W. Junglas, M.D., appeared at the hearing and testified as the medical expert (the "ME").  Tr. 68-74.  Based on a review of the medical record, the ME testified that Smith had a history of hypertension, substance abuse (alcohol and other drugs), nicotine abuse, non-prosthetic hypertrophy, Hepatitis C, PTSD, depression, and suicidal ideation.  Tr. 69.  The ME noted that Smith had been taking anti-depressants since his hospitalization for suicidal intention in June 2009 and that the anti-depressants "will affect his ability to deal with his daily life [as] his dosages are significant.  Tr. 69-70.  With regard to Smith's functional limitations, the ME opined that Smith had "marked restriction of his activities of daily living and maintaining social

functioning and maintaining concentration, persistence or pace for at least one year."  Tr. 71-72.

The ME explained that Smith's functional limitations became marked in June 2009, at about the

time of Dr. Zhao's report.  Tr. 72, 74.  He then testified that there is "no question [Smith's

alcohol and substance abuse] contributed to depression and lack of concentration, although they

say that it helps your social functioning and in some people it shuts people off.  That certainly

restricts your ability to live normal if you're using chronically."  Tr. 72.  The ME further stated

that, if Smith ceased his use of alcohol and illegal drugs, he would still be adversely affected by

the medications he was taking and that he "was not sure" if Smith could sustain employment

with the doses of medications he was taking at the time of the hearing.  Tr. 72.  However, he

stated that it was possible that Smith's medications could be decreased if he stopped using

alcohol and illicit drugs.  Tr. 72-73.

Counsel for Smith was given the opportunity to examine the ME.  Tr. 74.  Counsel asked

the ME to clarify his testimony regarding when Smith's functional limitations became marked.

Tr. 74.  The ME explained that, since June of 2009, Smith's functional limitations became

marked regardless of his substance abuse.  Tr. 74.  The ME also noted that Smith had stopped

using alcohol as of June 2009, appeared to be keeping his regular appointments, and was

compliant with treatment.  Tr. 74.  In addition, the ME stated that Smith's impairments met or

equaled Listing 12.02B. [12]  Tr. 82.

### 3.    Vocational Expert's Testimony

Nancy Borgeson (the "VE") appeared at the hearing and testified as a vocational expert.

Tr. 75-83.  She stated that Smith had previously worked as a truck driver (semi-skilled position

---

[12] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

at the medium exertional level but performed at the heavy exertional level), as well as a material handler (semi-skilled position at the heavy exertional level). Tr. 75-76. In a hypothetical, the ALJ asked the VE whether, given Smith's age, education, and experience, with no exertional limitations and moderate limitations on concentration, persistence, and pace, Smith would be able to return to his past relevant work. Tr. 76. The VE responded that Smith would be able to perform his former work as a material handler. Tr. 76. In addition, the VE stated that Smith could also perform other jobs that existed in significant numbers in the national economy, including stock worker/warehouse worker (780,000 jobs nationally, 37,000 jobs in Ohio, and 7,500 jobs locally); industrial cleaner (750,000 jobs nationally, 75,000 jobs in Ohio, and 11,000 jobs locally); and laundry worker (54,000 jobs nationally, 2,300 jobs in Ohio, and 450 jobs locally). The ALJ then asked the VE to consider whether an individual with Smith's vocational characteristics and the following limitations could perform any of the previously identified jobs: "[the individual] is able to perform simple, one to three step tasks without any frequent change with no production rate or no confrontation with co-workers or supervisors . . . ." Tr. 77-78. The VE responded that the hypothetical individual could perform the previously identified jobs or Smith's past relevant work as a material handler. Tr. 78.

### III. Standard for Disability

**A.      Standard Five-Step Disability Analysis**

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).  In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

**B.       Regulatory Requirements when Alcoholism or Drug Abuse is at Issue**

In the Contract with America Act of 1996 ("Welfare Reform Act"), Pub.L.No. 104–121, 110 Stat. 847, 852-53 (1996), codified at 42 U.S.C. §§ 423(d)(2)(C) and 1382c(a)(3)(J), Congress amended the Social Security Act to prohibit the award of benefits to individuals for whom alcoholism or drug addiction is a contributing factor material to their disability determination.  42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J).  The statute provides, in relevant part:

> An individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled.

42 U.S.C. §§ 423(d)(2)(C).  Under the statute and implementing regulation, the key factor in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether the individual would be disabled if he or she stopped using drugs or alcohol.  20 C.F.R. § 416.935(b)(1).  In order to determine whether a claimant's alcohol or drug use precludes an award of benefits, the ALJ must first determine whether a claimant is disabled when the claimant's substance abuse is taken into account.  20 C.F.R. § 404.1535(a).  Then, the ALJ must determine whether alcohol or drug use is a material contributor to the determination of disability, i.e., whether severe enough limitations would remain in the absence of alcoholism or drug addiction.  *Id.*  A determination that the remaining limitations would not be disabling will result in a finding that drug addiction or alcoholism is a "contributing factor material to the determination of disability."  20 C.F.R. § 416.935(b)(2)(i).  Conversely, a determination that the remaining limitations are disabling will result in a finding that the claimant is disabled independent of his drug addiction or alcoholism and, therefore, that drug addiction or alcoholism "is not a contributing factor material to the determination of disability."  20 C.F.R. § 416.935(b)(2)(ii).

14

In order to make the required determinations, the ALJ must first complete an initial five-step analysis and determine whether the claimant is disabled with substance abuse. *Underwood v. Comm'r of Social Sec.*, Case No. 08-2540, 2010 WL 424970 at *6, * 10 (N.D. Ohio Jan. 22, 2010).  If the answer is affirmative, the ALJ must conduct a second five-step analysis in order to determine if the claimant would still be disabled without the substance abuse. *Id.*

### IV.  The ALJ's Decision

The ALJ found that Smith met the insured status requirements of the Act through September 30, 2007.  Tr. 20.  The ALJ correctly outlined the relevant standard of review for a claimant with impairments caused by, or connected to, alcoholism or drug abuse.  Tr. 20.  At Step One of the sequential analysis, the ALJ determined that Smith had not engaged in substantial gainful activity since July 30, 2002, the alleged onset date.  Tr. 20.  At Step Two, she found that Smith had the following severe impairments: high blood pressure, Hepatitis C, PTSD, poly-substance abuse, depression, and suicidal ideation.  Tr. 21-22.  At Step Three, the ALJ found that, while using alcohol and drugs, Smith's depression, PTSD, and suicidal ideation equaled Listing 12.04 of 20 CFR Subpart 404, Subpart P, Appendix 1.  Tr. 22.

Under the second part of the analysis used when substance abuse is an issue, the ALJ found at Step Three that, if Smith stopped his substance abuse, his remaining impairments, although severe, would not meet or equal any Listing.  Tr. 23-24.  The ALJ then determined Smith's RFC and found that, if he stopped substance use, he could perform a full range of medium work with the following non-exertional limitations: "he would require simple 1-3 step tasks without frequent change, with no production rate or quotas, and with no confrontation from the public."  Tr. 24-25.  Under Step Four, the ALJ found that, if Smith stopped his substance abuse, he would still be unable to perform his past relevant work.  Tr. 25.  Under Step Five, the

15

ALJ concluded that, if Smith stopped his substance abuse, he would be capable of performing work that existed in significant numbers in the national economy.  Tr. 26-27.  Thus, the ALJ concluded that, because Smith would not be disabled if he stopped his substance use, the substance use disorder was a contributing factor material to the determination of disability and, as a result, Smith was not disabled within the meaning of the Social Security Act.  Tr. 27.

## V.  Arguments of the Parties

Smith objects to the ALJ's decision on two grounds.  First, Smith argues that the ALJ erred because she did not properly determine whether Smith's substance abuse was a contributing factor material to the determination of disability.  Second, Smith contends that the ALJ erred because she failed to evaluate properly the opinion of Smith's treating physician.

In reply, the Commissioner argues that substantial evidence supports the Commissioner's determination that Smith's substance abuse was a contributing factor material to the determination of disability.  The Commissioner also asserts that the ALJ properly evaluated the opinion from Smith's treating physician.

## VI.  Law & Analysis

### A.  Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial

16

evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.     The ALJ's Step Three Determination**

Smith argues that the ALJ improperly determined that his substance abuse was a material contributor to his disability.  Doc. 14, p. 14.  Specifically, Smith contends that the ALJ misstated portions of the ME's testimony and then improperly relied on the misstated testimony to support her determination that substance abuse was a contributing factor to Smith's impairments.  This argument has merit.

In her analysis under Step Three, the ALJ stated that the "impartial medical expert testified that, if the claimant ceases his substance abuse, he would have no impairments which meet or equal the criteria of any of the listed impairments . . . ." Tr. 23.  However, that is not what the ME stated during the hearing.  As correctly noted by Smith, the ME actually opined that Smith had "marked restriction of his activities of daily living and maintaining social functioning and maintaining concentration, persistence or pace for at least one year" and that these conditions became severe in June 2009 irrespective of Smith's substance abuse.  Tr. 72, 73-74.  The ME also noted that Smith had stopped using alcohol as of June 2009 and appeared to be compliant with treatment.  Tr. 74.  The ALJ's misstatement of the ME's testimony undermines her Step Three determination because she inaccurately relied on her misunderstanding of that

opinion to support her conclusion that Smith would have no marked functional limitations if he stopped his substance use.  The ME's actual testimony does not support the ALJ's conclusion.

Further, it is unclear from the ALJ's decision what weight, if any, she assigned to the opinion of the ME.  In her RFC analysis, the ALJ stated that, "[a]s for the opinion evidence, the residual functional capacity conclusions reached by the physicians employed by the State Disability Determination Services . . .  do deserve some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions . . . ."  Tr. 25.  Based on this vague statement, it is unclear that the ALJ assigned any weight to the opinion of the ME or only assigned weight to the opinions of the two state agency reviewing physicians.  This was error.  An ALJ "may not ignore" the opinions of medical experts and "must explain the weight given to the opinions in their decisions."  Soc. Sec. Rul. ("SSR") 96–6p, 1996 WL 374180, at *2 (July 2, 1996).  The ME specifically opined that Smith had marked restrictions in activities of daily living, marked restrictions in maintaining social functioning, and marked restrictions in maintaining concentration, persistence or pace, and that these restrictions existed irrespective of Smith's substance abuse.  Although the ALJ did not ignore this opinion, she misstated the opinion and then failed to explain what weight, if any, she assigned the opinion.  The ALJ's failure to explain the weight she assigned to the opinion of the ME denotes a lack of substantial evidence in support of her Step Three determination.

Moreover, the errors committed by the ALJ in this case were not harmless.  The ALJ used the ME's testimony at Step Three to determine whether Smith's mental impairments met or medically equaled one of the Listings.  Tr. 23.  Specifically, the ALJ determined that Smith did not satisfy the "paragraph B" criteria of listings 12.04.  Tr. 23.  To satisfy the "paragraph B" criteria, the mental impairment must result in at least two of the following limitations: "marked

restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." 20 C.F.R. Part 404, Subpart P, App. 1.  The ALJ erred by stating that the ME testified that Smith would have no impairments that met or equaled a Listing if he stopped his substance abuse.  This error was not harmless because the ME in fact opined that Smith had marked restrictions in all three areas set forth in "paragraph B" irrespective of his substance use.  The ALJ also failed to explain what weight she assigned to the ME's opinion.  If the ALJ had correctly quoted the ME's testimony and given that testimony weight, then Smith's mental impairments would satisfy the "paragraph B" criteria.  Therefore, it cannot be said that the outcome of the case at Step Three would not have been different had the ALJ properly cited and analyzed the opinion of the ME.  The ALJ's errors were not harmless in this case.

In sum, the ALJ erred by misstating the opinion of the ME and failing to properly analyze that opinion.  The Court therefore orders that this case be remanded so that the ALJ can properly consider and analyze the opinion of the ME.  On remand, the ALJ shall reconsider what effect the ME's actual testimony has on her determination at Step Three.

**C.    Remaining Issues**

Smith also asserts that the ALJ erroneously evaluated the opinion of his treating psychiatrist, Dr. Zhao, under the treating physician rule.  Doc. 14, p. 18.  Because remand is appropriate for the reasons stated above, the undersigned will not address this argument.  *See May v. Astrue*, No. 4:10CV1533, 2011 WL 3490186 (N.D. Ohio June 1, 2011) (declining to address plaintiff's remaining arguments since remand was already required because the ALJ failed to analyze the plaintiff's physical condition in relation to the Listed Impairments under

19

Step Three); *Trent v. Astrue*, Case No. 1:09CV2680, 2011 WL 841538 (N.D. Ohio March 8, 2011) (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).

### VII.  Conclusion

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff Robert E. Smith's applications for DIB and SSI is **REVERSED AND REMANDED** for further proceedings consistent with this Opinion and Order.[13]

Dated: July 2, 2013

_____
Kathleen B. Burke
United States Magistrate Judge

---

[13] This Opinion and Order is not nor should it be construed as an order requiring a determination on remand that Smith was in fact disabled during the relevant period.